IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JAN K. VODA, M.D.,<br><br>        Plaintiff,<br><br>vs.<br><br>MEDTRONIC INC. and<br>MEDTRONIC VASCULAR, INC.,<br><br>        Defendants. | Case No. CIV-09-95-L |

## O R D E R

Plaintiff, Dr. Jan K. Voda, is the holder of United States Patent No. 6,083,213 ("the '213 patent"), which was issued by the United States Patent and Trademark Office on July 4, 2000. Exhibit 1 to Complaint (Doc. No. 1-2). The '213 patent contains method claims; that is, it relates to plaintiff's inventive technique for using a guiding catheter to perform angioplasty of the left coronary artery. Method claims are in contrast to apparatus claims, which describe the structure of a piece of equipment such as a catheter.[1] Patent No. 5,445,625 ("the '625 patent"), which was also issued to plaintiff, is an apparatus claim; it describes his invention of an angioplasty guide catheter and reflects the catheter "in a relaxed state prior to insertion in the cardiovascular system." Voda v. Cordis Corp., 536 F.3d 1311, 1316 (Fed. Cir. 2008). Patent No. 6,475,195 ("the '195 patent"), which was issued to

---

[1] See Hewlett-Packard Co. v. Bausch & Lomb, Inc., 909 F.2d 1464, 1468 (Fed. Cir. 1990) ("apparatus claims cover what a device *is*, not what a device *does*") (emphasis in original).

plaintiff on November 5, 2002, contains both method and apparatus claims. Id. at 1317.

On October 30, 2003, plaintiff filed a patent infringement suit in this court against Cordis Corporation. Voda v. Cordis Corp., Case No. CIV-03-1512-L (W.D. Okla. filed Oct. 30, 2003) [hereinafter referred to as "the Cordis case"]. Plaintiff claimed that catheters manufactured and sold by Cordis infringed all three patents. The Cordis case was tried to a jury in May 2006. On May 25, 2006, the jury returned a verdict in favor of plaintiff, finding that Cordis infringed each of the patents in suit and that claims 1, 2, and 3 of the '213 patent were not invalid due to anticipation or obviousness. Cordis Corp., Jury Verdict (Doc. No. 337). The jury found plaintiff was entitled to a reasonable royalty rate of 7.5 percent of Cordis' gross sales of the infringing catheters. Id. at 8. Thereafter, based on the parties' stipulation and the court's rulings regarding prejudgment interest, enhanced damages, and attorney's fees, the court entered final judgment. The Judgment reflected that the accused devices infringed Claim 1 of the '195 patent and all of the claims of the '213 and '195 patents. Cordis Corp., Judgment at 1-2 (Doc. No. 390).[2] The Judgment further specified:

---

[2]After the court ruled on Cordis' renewed motion for judgment as a matter of law, the court issued an Amended Judgment. The Amended Judgment differed from the original Judgment solely with respect to damages. The Amended Judgment increased the amount of compensatory damages and corresponding prejudgment interest and reflected the court's decision to treble – rather than double – the compensatory damages. Cordis Corp., Amended Judgment (Doc. No. 447).

> Plaintiff is entitled to a reasonable royalty of 7.5 percent on defendant's sales of infringing XB, XBC and XBLAD catheters, amounting to *the greater of*: (1) $3,803,094 for infringement of U.S. Patent No. 6,083,213 from July 4, 2000 to May 15, 2006; (2) $2,073,982 for infringement of U.S. Patent No. 5,445,625 from March 14, 2002 to May 15, 2006; or (3) $1,443,592 for infringement of U.S. Patent No. 6,475,195 from October 30, 2003 to May 15, 2006.

Id. at 2 (emphasis added).

On January 22, 2009, plaintiff filed this action against defendants Medtronic Inc. and Medtronic Vascular, Inc. Plaintiff contends that defendants' manufacturing and sales of Medtronic EBU Guiding Catheters infringe Claims 1 and 2 of the '213 patent. *See* Complaint at ¶¶ 15, 17-21 (Doc. No. 1). Plaintiff alleges that defendants promote the use of their catheters "in a manner that contributes to or induces the infringement of the method covered by the '213 patent claims." Id. at ¶ 18. Claims 1 and 2 of the '213 patent teach:

> 1. A method for advancing a catheter through the aorta and into a coronary ostium, the aorta having an arch and an inner wall opposite the ostium, comprising the steps of:
>
> providing a catheter including an elongate catheter body having a proximal end and a distal end and having a central lumen from the proximal end to the distal end adapted to slidably receive a therapeutic catheter, the catheter body including a tip at the distal end of the catheter body adapted to removably lodge in the coronary artery ostium;
>
> advancing the catheter body distal end through the aortic arch; and

> engaging the aorta inner wall with a portion of the catheter body such that when the distal end of the catheter is positioned in the ostium, the catheter body engages the opposite wall of the aorta along a line having a length of about 1.5 cm or greater.
>
> 2. A method in accordance with claim **1**, wherein the ostium is the left coronary ostium.

Exhibit 1 to Complaint at 30-31 (Doc. No. 1-1).

This matter is before the court on defendants' motion for partial summary judgment.[3] Defendants argue plaintiff is not entitled to recover damages for any sales prior to November 16, 2010 because the claims of the '213 patent were substantively changed during reexamination. While this argument is based on the patent law doctrine of intervening rights,[4] it is dependent upon a finding of judicial estoppel based on the *Cordis* case. Defendants also seek a ruling that they cannot be liable for contributory infringement because the accused devices are suitable for substantial non-infringing uses.

Summary judgment is appropriate if the pleadings, affidavits, and depositions "show that there is no genuine issue as to any material fact and that the movant is

---

[3]The court notes that its analysis of defendants' motion was hampered by their failure to comply with LCvR 56.1 which requires the brief in support of a motion for summary judgment to "begin with a section that contains a concise statement of material facts to which the moving party contends no genuine issue of fact exists. The facts *shall be numbered* and shall refer with particularity to those portions of the record upon which the movant relies." LCvR 56.1 (emphasis added).

[4]Plaintiff contends defendants waived this defense by failing to plead or disclose it. The court, however, finds it need not address the waiver issue, as the doctrine of intervening rights is not applicable in this case.

4

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). Any doubt as to the existence of a genuine issue of material fact must be resolved against the party seeking summary judgment. In addition, the inferences drawn from the facts presented must be construed in the light most favorable to the nonmoving party. <u>Board of Education v. Pico</u>, 457 U.S. 853, 863 (1982). Nonetheless, a party opposing a motion for summary judgment may not simply allege that there are disputed issues of fact; rather, the party must "set out *specific* facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2) (emphasis added). *See also*, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Anderson</u>, 477 U.S. at 249-50 (citations omitted). In addition, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). The court, however, may not make determinations of credibility nor weigh evidence. <u>Gossett v. Oklahoma</u>, 245 F.3d 1172, 1175 (10th Cir. 2001).

<u>Intervening Rights</u>

The Federal Circuit recently issued an opinion clarifying the doctrine of absolute intervening rights. Marine Polymer Techs., Inc. v. HemCon, Inc., 659 F.3d 1084 (Fed. Cir. 2011). The Court noted:

> The doctrine of absolute intervening rights protects an accused infringer's right to continue using, selling, or offering to sell specific products covered by reissued or reexamined claims when the particular accused product had been made before the date of the reissue or reexamination and the scope of the claims is substantively changed. . . .  However, intervening rights do not apply where the accused product "infringes a valid claim of the reissued patent which was in the original patent."  35 U.S.C. § 252.  Therefore, intervening rights are available only if the original claims have been "substantively changed," and "in determining whether substantive changes have been made, we must discern whether the *scope* of the claims [has changed], not merely whether different words are used." *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1346 (Fed. Cir. 1998). Although we have not directly addressed whether arguments made to the PTO during reexamination can amend the scope of claims for purposes of the intervening rights doctrine, we have consistently held that arguments made to the PTO on reexamination can create an estoppel or disavowal and thereby change the scope of claims even when the language of the claims did not change.

Marine Polymer Techs., Inc., 659 F.3d at 1091 (emphasis in original).

Defendants contend that plaintiff substantively changed the scope of the '213 patent claims during an *ex parte* reexamination process initiated by defendants.[5] Defendants' first reexamination request, filed on June 18, 2009, was granted by the

---

[5] Defendants do not – and indeed, cannot – argue that the language of Claims 1-3 of the '213 patent was modified during the reexamination process.

United States Patent and Trademark Office ("Patent Office") on July 14, 2009. In this request, defendants argued "claims 1-3 are anticipated by Bourassa, Bower, Amplatz, and Sylvanowicz. Claims 4-5 are anticipated by Bourassa and Bower. Claims 1-3 are rendered obvious by Bourassa, Bower, Amplatz, Sylvanowicz, Bourassa *in view of* Bower, Amplatz *in view of* Bower, and Sylvanowicz *in view of* Bower."[6] Exhibit 11 to Medtronic's Motion for Partial Summary Judgment on Infringement at 90 [page 89 of the document] (Doc. No. 132-11) (emphasis in original) [hereinafter cited as "Medtronic's Motion].

On May 21, 2010, the Patent Office issued notice that claims 1-5 of the '213 patent were subject to reexamination and were rejected. Exhibit 15 to Medtronic's Motion. Thereafter, plaintiff met in person with the patent examiner,[7] and on August 19, 2010, the Patent Office issued notice that claims 1-3 of the '213 patent were confirmed upon reexamination and claims 4 and 5 would be allowed based on the clarification that advancement of the catheter through the aorta included the entire aortic arch. Exhibit 18 to Medtronic's Motion. In his statement of reasons, the patent examiner distinguished Bower on the ground that it "fails to teach such an advancement [through the aortic arch] as it bypasses the majority of the aortic arch

---

[6]The particular references on which defendants sought reexamination were: (1) U.S. Patent No. 5,267,982 to Sylvanowicz; (2) U.S. Patent No. 5,299,574 to Bower; (3) Amplatz et al., "Mechanics of selective coronary artery catherization via femoral approach," Radiology, 89(6): 1040-7 (1967); and Bourassa et al., "Selective Coronary Arteriography by the Percutaneous Femoral Artery Approach," Am. J. Roentgenol, Radium, Ther. Nucl. Med., 107(2): 377-83 (1969). Exhibit 11 to Medronic's Motion at 4 [page 3 of the document].

[7]*See* Ex Parte Reexamination Interview Summary at Exhibit 16 to Medtronic's Motion.

due to a brachial artery catheter insertion." Id. at 2. While the first reexamination request was pending, defendants filed a second *ex parte* request for reexamination.[8] That request was denied approximately a month later, on September 22, 2010. Exhibit 17 to Dr. Voda's Motion for Partial Summary Judgment on Invalidity and Certain Affirmative Defenses and Memorandum in Support Thereof (Doc. No. 130-17) [hereinafter cited as "Plaintiff's Motion"]. The patent examiner's decision that no substantial new question of patentability was raised by the second request and the prior art[9] cited therein was upheld on review. Id. at 2. Defendant filed a third *ex parte* request for reexamination on October 18, 2010, which the Patent Office granted in part on November 19, 2010. Exhibit 18 to Plaintiff's Motion (Doc. No. 130-18). The Patent Office denied defendants' request for reexamination in light of the Bower and Sylvanowicz patents, which had been previously considered,[10] but granted the request with respect to two additional citations.[11] On September 15,

---

[8] The second request was filed on August 18, 2010, the day before the Patent Office issued its Notice of Intent to Issue Ex Parte Reexamination Certificate. The first *ex parte* reexamination remained pending until the Patent Office issued the reexamination certificate on November 16, 2010. *See* Exhibit 2 to Notice of Intent to Issue Reexamination Certificate and Request to Lift the Instant Stay at 8 [page 3 of the document] (Doc. No. 74-2). Thus, the third request for *ex parte* reexamination was also filed while the first reexamination request was pending.

[9] In the second request, defendants cited as prior art U.S. Patent No. 4,822,345 to Danforth and a Melvin P. Judkins article entitled "Percutaneous Transferred Selective Coronary Arteriography," published in 6 Radiologic Clinics of America (No. 3) 467 (Dec. 1968). Exhibit 17 to Plaintiff's Motion at 3 [page 2 of the document].

[10] Exhibit 18 to Plaintiff's Motion at 13, 15 [pages 12 and 14 of the document].

[11] In addition to the Bower and Sylvanowicz patents, defendants sought reexamination based on two publications: (1)Thomas F. Rizzo and Daniel K. Silverstein, "Use of the Arani Guiding Catheter with a Twist", 20 Catheterization & Cardiovascular Diagnosis 257 (1990) [hereinafter cited as "Rizzo"] and (2) USCI, "PCTA in Perspective", ch. 3 (1986). Exhibit 18 to Plaintiff's Motion at 5-6

2011, the Patent Office indicated its intent to, once again, confirm Claims 1-3 and 5 of the '213 patent, but to reject Claim 4 as anticipated by Rizzo. Exhibit 19 to Plaintiff's Motion. Defendants' fourth request for reexamination, which was filed August 26, 2011, was also denied. Thus, the claims at issue in this action have been subject to four reexamination requests before the PTO and ultimately confirmed each time.

Defendants claim that during the reexamination proceedings, plaintiff disavowed that the radial or brachial approach was within the scope of the '213 patent. Plaintiff does not deny that he distinguished prior art that taught the radial or brachial approach during the reexamination. Indeed, it is undisputed that plaintiff argued to the Patent Office that:

> Bower does not disclose a catheter that extends through the aortic arch, as required by Claim 1. . . . Bower discloses only a catheter for introduction through the brachial artery. In this approach, the catheter is inserted percutaneously into the brachial artery, advanced up the brachial artery into and through the [axilliary] artery, through the right subclavian artery, and through the innominate artery into the aorta.
>
> Because of the location of the innominate artery with respect to the aorta, a catheter inserted by this approach bypasses the major portion of the aortic arch. There is no disclosure of the '213 patent of a method step of passing the catheter tip through <u>less</u> than the entire aortic arch. Further, "the aortic arch" does <u>not</u> mean "a <u>portion</u> of the aortic arch." The only reasonable construction of "the aortic arch" is "the *entire* aortic arch." Bower therefore

---

[pages 4-5 of the document].

>does not disclose the step recited in Claim 1 of "advancing the catheter body distal end through the aortic arch." Bower thus fails to anticipate any of Claims 1-3.

Exhibit 14 to Medtronic's Motion at 7-8 [pages 11-12 of the document] (Doc. No. 132-14). Plaintiff also does not deny that his arguments to the Patent Office indicate that the '213 patent was limited to the femoral approach. Plaintiff does, however, contest that his submissions changed the scope of the patent claims; rather, he contends Claims 1-3 of the '213 patent were always directed to the femoral approach as they require the catheter to advance through the aortic arch. The aortic arch is a medical term of art,[12] and the parties agree that when used in Claim 1 of the '213 patent it refers to the "entire aortic arch." Voda v. Medtronic, Inc., Case No. CIV-09-95-L, order at 4 (W.D. Okla. Dec. 8, 2011) (Doc. No. 181).

In support of their assertion that plaintiff's arguments to the Patent Office amounted to a change in scope, defendants point to evidence offered during the *Cordis* case. They argue that

>[a]t trial, Dr. Voda's infringement expert used a radial approach procedure to demonstrate how Cordis infringed claim 1 of the '213 patent. After trial, page 1 of Dr. Voda's post trial motions pointed to a radial procedure and cited to documents describing the radial use of Cordis' catheters as evidence of infringement that supported the verdict.

---

[12]Gray's Anatomy defines the aortic arch as commencing "at the upper border of the second chondro-sternal articulation of the right side, and pass[ing] at first upwards and backwards and from right to left, and then from before backwards, to the left side of the lower border of the fourth dorsal vertebra behind. Its upper border is usually about an inch below the upper margin of the sternum." Exhibit 2 to Dr. Voda's Response in Opposition to Medtronic's Motion for Partial Summary Judgment on Infringement at 6 (Doc. No. 155-2).

Medtronic's Motion at 19 (footnotes omitted).  Defendants' argument, however, results from a fundamental misunderstanding of the breadth of the *Cordis* case and the court's judgment.  Unlike this action, the *Cordis* case concerned three patents issued to plaintiff, two of which included apparatus claims.  During the *Cordis* case, plaintiff presented the testimony of Dr. Stephen Almany.  Dr. Almany testified at length regarding both the '195 patent and the '213 patent.[13]  Toward the end of his testimony on direct, after he had explained his opinions regarding the both patents, the following colloquy occurred:

> Q. Before we finish up I wanted to ask you some questions about stents.  There has been a lot of discussion here about stents.  In your career, have you used Voda Catheters to deliver stents?
>
> A. Yes, I have.
>
> * * *
>
> Q. How does the XB compare to the Voda in terms of its ability to deliver stents?
>
> A. The XB, again in the body, looks the same.  I will give credit to them, that probably these curves make the transition between the substantially straight legs a little bit more gradual.
>
> So in the older days, that probably would have been a big difference.  Now it doesn't matter, because the stents we have now are lower profile and so these fly through anything.

---

[13]Dr. Almany was not asked to render an opinion with respect to the '625 patent.  Exhibit 5 to Medtronic's Motion at 36 [transcript page 597] (Doc. No. 132-5).

Q.      I want to show you what has been marked as Defendant's Exhibit 1088. This is the Physicians Guide for the Palmaz-Schatz. Have you seen this before?

A.      Yes, I have.

Q.      Dr. DiMatteo (sic) has several times referred to this as the Bible for using a Palmaz-Schatz?

* * *

Q.      Do you, as an interventional cardiologist, consider Physician Guides like this to be equivalent to the Bible for using this stent?

A.      If you guys were paying attention when they put up some of the stuff that I have done, I actually wrote the monograph on the radial artery, and by no means is this the bible, it is my opinion, for a guy who is fairly experienced doing it, but is it what it is, and even the stuff that I did, not my book chapters, and stuff, but that is not peer-reviewed. That doesn't mean my colleagues looked at it and agreed.

        This is Dr. Schatz, who is a very well-known gentleman, who developed some of the early stents, the Palmaz-Schatz stent. These are his opinions, it is all they are.

Q.      There is some language in here that Mr. DiMatteo undoubtedly will show you in a few minutes in which it says, Don't use the Voda for delivering this catheter. Have you see that portion of this?

A.      I heard about it actually yesterday, but I had never heard about it before.

Q.      Was that a widely-held belief among interventional cardiologists?

A.      No, no.

> Q. I'll show you one of the Cordis's other Physician Guides, while we are on the topic of Physician Guides, Exhibit 199.
>
> This is entitled Physicians Guide, the Radial Approach to Angiography and Intervention. It is put out by Cordis.
>
> Have you seen this before?
>
> A. It is the second best one written on the subject.
>
> Q. Second to yours, I assume.
>
> A. Exactly.
>
> Q. Let's take a look at page 25 of this Physicians Guide put out by Cordis. This reads, XB technique-extra backup. The XB curve was also adapted from a guiding catheter line. It is intended for cannulating only the left coronary artery from the left arm approach, radial or brachial. The key feature of this design is the long catheter segment between the primary and secondary curves that buttresses against the contralateral wall of the ascending aorta, providing solid support during angiography.
>
> Do you agree with that statement?
>
> A. I do.
>
> Again, radial cases are – the support is much more vital and it is much more difficult. A lot of times we have to use extra backup catheters.
>
> This is their own publication, but I don't think it leaves much doubt in your mind that a significant portion of their catheter is engaged upon the aorta.

Exhibit 5 to Medtronic's Motion at 47-48 [transcript pages 622-26] (Doc. No. 132-5).

Based in large part on the answer to the last question, defendants contend this line

of testimony concerns solely the '213 patent because only that patent teaches length of engagement. That contention, however, ignores that Claims 2 and 6 of the '195 patent also speak to length of engagement, albeit not with the numerical specificity of the '213 patent.[14] Likewise, defendants' assertion that judgment in the *Cordis* case "was entered based on infringement of the '213 patent rather than the '195 or '625 patents"[15] is belied by the plain language of the court's Judgment and Amended Judgment, both of which recite that manufacture, use and sales of Cordis' catheters infringed Claim 1 of the '625 patent, Claims 1-5 of the '213 patent, and Claims 1-6 of the '195 patent. Cordis Corp., Judgment at 1-2 (Doc. No. 390); Amended Judgment at 1-2 (Doc. No. 447). Defendants' assertion that plaintiff's citation of Exhibit 199 in response to Cordis' renewed motion for judgment as a matter of law relates to the '213 patent is likewise flawed. Plaintiff's argument, and citation of Exhibit 199, was in response to Cordis' arguments regarding the straight and

---

[14]Claim 2 of the '195 patent claims a catheter "wherein *substantially the entire length* of the first substantially straight leg seats against a wall of the aorta opposite an ostium of the coronary artery when a distal end of the tip portion is positioned within the ostium of the coronary artery." Cordis Corp., order at 7 (W.D. Okla. May 8, 2006) (Doc. No. 309) (emphasis added). Likewise, Claim 6 speaks to a method for guiding the path of a therapeutic catheter that seats "*substantially the entire length* of the first substantially straight leg against a wall of the aorta opposite an ostium of the coronary artery when a distal end of the tip portion is positioned within the ostium of the coronary artery." Id. at 9 (emphasis added). Indeed, Dr. Almany referenced this substantial engagement with respect to the '195 patent and the accused devices earlier in is testimony. Exhibit 5 to Medtronic's Motion at 40 [transcript page 606].

[15]Medtronic's Reply in Support of its Motion for Partial Summary Judgment at 3 (Doc. No. 171).

substantially straight claims in the '625 and '195 patents.[16] That language does not appear in Claims 1 and 2 of the '213 patent.

Given these flaws in defendants' analysis, their judicial estoppel argument fails as matter of law. The doctrine of judicial estoppel is "a discretionary remedy courts may invoke 'to prevent "improper use of judicial machinery."'" Johnson v. Lindon City Corp., 405 F.3d 1065, 1068 (10th Cir. 2005).[17] The doctrine provides that

> "[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." Although noting that this rule, known as judicial estoppel, is "'probably not reducible to any general formulation of principle,'" the Court noted several factors which other courts have typically used to determine when to apply judicial estoppel. "First, a party's later position must be 'clearly inconsistent' with its earlier position." Moreover, the position to be estopped must generally be one of fact rather than of law or legal theory. Second, "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled.'" The requirement that a previous court has accepted the prior inconsistent factual position "ensures that judicial estoppel is applied in the narrowest of circumstances." Third, "whether the party seeking to assert an inconsistent position would derive an

---

[16]*Compare* Cordis Corp., Cordis' Motion for Judgment as a Matter of Law and Supporting Brief at 3-5 (Doc. No. 401) *with* Plaintiff's Opposition to Cordis' Renewed Motions for Judgment as a Matter of Law at 1 (Doc. No. 409).

[17]As the doctrine of judicial estoppel is not unique to patent cases, the Federal Circuit would apply the standards enunciated by the Court of Appeals for the Tenth Circuit on this issue. *See* Research Corp. Techs., Inc. v. Microsoft Corp., 536 F.3d 1247, 1255 (Fed. Cir. 2008).

> unfair advantage or impose an unfair detriment on the opposing party if not estopped."

Id. at 1069 (citations omitted). Defendants, however, cannot establish that plaintiff took a position in the *Cordis* case that is clearly inconsistent with his position before the Patent Office or this court. There is nothing in the cited testimony or briefing that clearly reflects a claim by plaintiff that the brachial or radial approach infringed the method claims of the '213 patent. Moreover, whether the radial or brachial approach infringed the '213 patent was not an issue in the *Cordis* case; rather, the issues concerned the proper construction of "along a line" and the length and location of the catheter's engagement with the wall of the aorta. Thus, estoppel cannot be found on that basis. *See* Altair Eng'g, Inc. v. LEDdynamics, Inc., 413 Fed. Appx. 251, 256-57 (Fed. Cir. 2011) (unpublished).

Defendants cannot demonstrate that the scope of the '213 patent has changed since the *Cordis* case. Defendants have not pointed to any clear evidence that plaintiff previously charged that brachial or radial approaches infringed the '213 patent and then disavowed that position before the Patent Office during the reexamination proceedings. Moreover, the language of the claims at issue – particularly given that "aortic arch" is a medical term of art – limits the patent claims to the femoral approach; only that approach traverses the aortic arch and not just a portion thereof. As defendants have not shown that the scope of the '213 patent has changed since the *Cordis* case, the doctrine of absolute intervening rights is not

16

applicable. Defendants' motion for summary judgment on that basis must therefore be denied.

## Substantial Non-Infringing Use

While defendants, as sellers of medical devices do not directly infringe the method claims at issue in this case, they can be vicariously liable. Section 271(b) of Title 35 provides "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). Likewise, § 271(c) imposes liability on "[w]hoever offers to sell or sells within the United States . . . [an] apparatus for use in practicing a patented process . . . knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use". 35 U.S.C. § 271(c). "Liability for either active inducement of infringement or for contributory infringement is dependent upon the existence of direct infringement." Joy Techs., Inc. v. Flakt, Inc., 6 F.3d 770, 774 (Fed. Cir. 1993). In addition to direct infringement, plaintiff must demonstrate that defendants "knowingly induced infringement and possessed specific intent to encourage another's infringement." Minnesota Mining & Mfg. Co. v. Chemque, Inc., 303 F.3d 1294, 1305 (Fed. Cir. 2002), *cert. dismissed* 538 U.S. 972 (2003). Contributory infringement likewise requires proof of defendants' knowledge and that the devices have "no substantial non-infringing uses." Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc., 424 F.3d 1293, 1312 (Fed. Cir. 2005) (citation omitted).

Defendants contend they are entitled to summary judgment on the ground that the accused devices can be used in the radial or brachial approach and therefore have a substantial non-infringing use. The court finds genuine issues of material fact exist regarding whether the accused catheters have substantial non-infringing uses. Summary judgment is thus inappropriate. *See* Cross Med. Prods., Inc., 424 F.3d at 1314.

## Conclusion

For the reasons set forth above, Medtronic's Motion for Partial Summary Judgment on Infringement (Doc. No. 132) is DENIED.

It is so ordered this 14th day of December, 2011.

*/s/ Tim Leonard*
TIM LEONARD
United States District Judge